*19
 
 ROSENN, Circuit Judge.
 

 This appeal, arising out of a unique set of facts, raises an important question pertaining to a bankruptcy court’s discretion in authorizing a trustee in a Chapter 11 reorganization to sell the primary asset of the debtor without first resolving allegations of fraud committed by the prospective purchaser and its principals. The fraud is alleged to have been committed by the purchaser and the debtor’s former counsel in the acquisition of a mortgage against the asset. The debtor’s asset comprised a group of old mill buildings which the debtor leased to retail, commercial, and light industrial tenants. Because the principals of the debtor, a partnership that filed the petition for Chapter 11 reorganization, were in prison, the bankruptcy court appointed a trustee for the estate.
 

 The Trustee, who had brought an adversary proceeding with the approval of the debtor, to set aside the mortgage on the property acquired by assignment from the original mortgagee allegedly by prepetition fraud, concluded that it would be in the best interests of the bankrupt estate to accept an offer to purchase the property from the mortgagee and settle the adversary proceeding to set aside the mortgage on it. The bankruptcy court, over the vigorous objection of the debtor, approved the sale and settlement. The debtor timely appealed to the district court which affirmed. The debtor thereupon appealed to this court. We also affirm.
 

 I.
 

 Bruce and Andrew Jeremiah are the partners of the debtor, the Silver Spring Center, a Rhode Island general partnership. The Silver Spring Center (the “Center”),
 
 [1]
 
 owned a 500,000-square-foot former textile factory complex consisting of approximately 18 buildings located in Providence, Rhode Island. Its business essentially was to lease space in this complex to retail, commercial, and light industrial tenants. The Jeremiahs previously had been tenants in the Center for 30 years and had owned it for approximately the past 14 years.
 

 In 1988, the Jeremiahs engaged attorney Z. Hershel Smith to represent them in a dispute they were having with the Center’s prior mortgagee, the New Bedford Institution for Savings (“The Bank”). Upon Smith’s recommendation, the Center filed a Chapter 11 bankruptcy petition. While Smith was representing the Center in the bankruptcy proceedings, it developed that he also was representing some of its creditors. Due to this conflict of interests, his mismanagement of the Center’s funds, and a request of the then-Chapter 11 trustee, the Jeremiahs discharged Smith. With the assistance of new counsel, they negotiated the dismissal of the reorganization petition in June 1991. Smith has since been disbarred, convicted of fraud and embezzlement of clients’ funds, and sentenced to 10 years imprisonment.
 

 In early 1993, the Jeremiahs began to renegotiate the $2.1 million mortgage on the Center with the mortgagee. At the same time, Smith, without the consent or knowledge of the Jeremiahs, allegedly also entered into negotiations with their mortgagee on behalf of himself and the R.S.S. Realty Trust (“RSS”), a Rhode Island Corporation, to purchase the mortgage, using confidential information gained during his three-year prior representation of the Center. As a result, The Bank ceased negotiations with the Jeremiahs and instead sold the $2.1 million mortgage to RSS for $200,000. RSS’s principals are William Ricci and the Smith Family Trust, of which attorney Smith’s children are the beneficiaries. Ricci, like Smith, also is a convicted felon, having been convicted of various fraud and other charges.
 
 [2]
 

 Shortly thereafter, RSS filed an
 
 ex parte
 
 petition in a Rhode Island state court alleging waste on the part of the Center, seeking to have the Center placed in receivership, and seeking to foreclose its recently acquired mortgage. Because of RSS’s actions, in December 1994, the Center once again sought Chapter 11 protection in the bankruptcy court. Because the Jeremiahs, at the time,
 
 *20
 
 were in jail for allegedly dealing drugs out of the Center,
 
 [3]
 
 the court appointed the appellee, Andrew S. Richardson, Trustee to operate the Center.
 

 The Jeremiahs vehemently contested the validity, extent, and priority of the mortgage RSS had acquired from the New Bedford Bank. Therefore, the Trustee commenced an adversary proceeding against RSS and Smith in the bankruptcy court. Specifically, the Trustee sought to have the mortgage declared null and void, or alternatively, conveyed to the Chapter 11 Trastee, or, as a further alternative, held in constructive trust for the Jeremiahs. The Trustee based his complaint primarily upon Smith’s prior representation of the Jeremiahs and the alleged breach of his fiduciary duties to his former clients.
 

 In addition to the disputed $2.1 million dollar RSS mortgage, the Center was subject to (1) liens for $850,000 in unpaid real estate taxes in favor of the City of Providence for the period 1989 to 1996; (2) a $30,000 lien held by the Providence Water Supply Board; and (3) a $16,000 lien held by the Narragansett Bay Commission. The property also has significant environmental problems which would cost anywhere from $850,000 to at least $1.5 million to remedy. Furthermore, the Center is in deteriorating condition, particularly the roofs, which need at least a half million to $1 million of repairs. Finally, pre-petition, unsecured creditors hold claims for approximately another $75,000, including $16,000 owed to the United States Coast Guard.
 

 The Jeremiahs, on the other hand, contend that the Center’s financial picture is not quite so grim. For instance, they allege that the real estate taxes can be cut by as much as one-half because the property is significantly overvalued. They also believe that the $30,-000 Providence Water Supply Board and $16,000 Narragansett Bay Commission liens can be reduced due to errors in the meter readings and billings. As is common in a Chapter 11 proceeding, the Jeremiahs have no real financial equity in the Center.
 

 During the period the Trustee operated the Center, he earned approximately $5,000 per month “profit.” He achieved this “profit,” however, only by not paying any debt service (ie., the mortgage), any real estate taxes, or any payments on the Center’s pre-petition outstanding obligations. The Jeremiahs dispute the Trustee’s characterization of the poor financial health of the Center, and raise questions about the Trustee’s rent collection and accounts receivable figures, which they contend would show that the Center was in better condition than that painted by the Trustee.
 

 While the adversary proceeding against RSS and Smith was pending, Ricci submitted a proposal to the Trustee in December 1996, offering to resolve the adversary proceeding and to purchase the Center. Ricci’s offer consisted of a lump-sum cash payment of $150,000 to the Trustee in exchange for conveyance of the title to the property and dismissal of the adversary proceeding. This $150,000 would cover all claims held by unsecured creditors and all administrative costs of the bankruptcy estate. Ricci’s offer to purchase the Center was subject to all existing liens against the property (except for the $16,000 lien held by the United States Coast Guard). To assure the purchase, Ricci placed the full $150,000 purchase price in escrow pending approval of his offer by the bankruptcy court.
 

 Although the Trustee previously had characterized the adversary proceeding as a “good claim” and thought his chances of winning it were favorable, he accepted Ricci’s offer. He concluded that it was the only credible plan on the horizon; the Jeremiahs had not submitted a viable alternative. Thus, the Trustee filed a Notice of Intended Sale and Application to Compromise with the bankruptcy court. He sent a copy of this notice to all creditors and interested parties. The notice required that any party objecting to the proposed sale and compromise file an objection with the court by February 7,1997, and that any higher bids be submitted by that same date along with a 5% deposit.
 

 
 *21
 
 No creditors objected to the Trustee’s proposed sale and compromise, nor did anyone, including the Jeremiahs, submit a competing offer. On the last day permitted, February 7, 1997, however, the Jeremiahs filed an objection and sought additional time to make a counteroffer. The basis for their objection was that the Ricci proposal would deprive them of their property and that “the alleged wrongdoers[ — Smith and Ricci — jwould be rewarded for their acts.” The Jeremiahs repeatedly assert or imply throughout their brief that Smith is involved in the purchase of the Center along with Ricci. The record, however, contains no evidence to support this assertion. In their objection, the Jeremiahs merely stated that they would
 
 “arrange,
 
 to secure payment of 100% of the outstanding debt to- unsecured creditors, and
 
 arrange
 
 payment of any and all administrative costs of this bankruptcy, and
 
 mil present
 
 this [hypothetical plan] formally to the court [either] [when ordered by the court or after] the adversary proceeding has been heard and determined by [the court].” (emphasis added).
 

 Six days later, on February 13, 1997, the bankruptcy court held a hearing on the proposal. At that time, the Jeremiahs objected and again requested additional time to present a counteroffer to the court. For their accommodation and as an additional opportunity to purchase the property, the court, over the Trustee’s objections, continued the hearing for six weeks until March 31,1997. As a condition of the continuance, the court required the Jeremiahs to provide the Trustee with sufficient collateral to fund an alternative proposal. Although the Trustee questioned the value of the collateral offered, the Jeremiahs tendered, and the Trustee ultimately accepted, a $175,000 mortgage on the residence of Andrew and Faith Jeremiah.
 

 During the six week extension, the Jeremiahs did not come up with a counteroffer. Not until after the six weeks had expired, on the morning of the March 31, 1997 hearing, did the Jeremiahs submit for the first time their “proposal.” Undated, unfiled, and incomplete, the document, entitled “Debtor’s Proposal to Purchase Assets,” stated that the Jeremiahs would pay to the Trustee sufficient funds to pay (1) all pre- and post-petition creditors excepting those from which they had obtained waivers and made alternative arrangements and (2) all administrative costs, in exchange for (1) the Trustee’s assignment to them of all assets of the Silver Spring Center subject to all existing liens, (2) the court’s dismissal of the Chapter 11 petition, and (3) the court retaining jurisdiction over the adversary proceeding. The proposal, however, lacked necessary specifics; it had no purchase price, no time frame for completion, or any statement as to how the proposed payments would be funded. During this hearing, however, the Jeremiahs’ attorney stated that he possessed a $20,000 bank check; that he had unspecified, undocumented, “written agreements” that $50,000 would be wired to his account before noon that day; that he could sell within two weeks an undocumented and unsubstantiated Rolls Royce for $40,000; and that he had signed waivers from several unsecured creditors totaling almost $70,000.
 
 [4]
 

 The Trustee recommended that the court reject this last-minute proposal as inadequate. The court agreed with the Trustee’s assessment, concluding that the Jeremiahs’ “constant last-minute efforts ... just d[id]n’t cut it.” The court then accepted the Trustee’s business judgment, and “reluctantly” approved the sale and compromise. In its brief, two-page order that followed, the court explained that its approval was based on the reasons argued by the Trustee, the United States Trustee, and counsel representing Ricci, and that the proposed compromise and sale were in the best interest of the estate. The court concluded that the Trustee’s proposal constituted a reasonable exercise of his business judgment.
 

 The Jeremiahs appealed to the district court and obtained a stay. Subsequently, the district court duly entered a judgment and order vacating the stay, and affirming the bankruptcy court’s approval of the sale and
 
 *22
 
 compromise. The Jeremiahs again appealed and moved that this court waive the requirement of a supersedeas bond to stay the proposed sale. This court denied their motion. On March 5, 1998, the Trustee conveyed all his right, title, and interest in the Silver Spring Center to S.S.C. Realty Associates, as the nominee of William Ricci.
 

 II.
 

 Although both parties raise several issues on appeal, the dispositive issue is whether, in light of the credible allegations of fraud suiTounding the Center’s mortgage, the bankruptcy court’s approval of the Trustee’s proposed sale and compromise to Ricci constituted an abuse of the court’s discretion. We discuss the subordinate issues briefly before addressing the abuse of discretion question.
 

 A.
 
 Jurisdiction
 

 The Jeremiahs’ first argument is that the bankruptcy court lacked jurisdiction because it had not yet determined the status of the adversary proceeding pending against Smith and RSS. This is so, they contend, because a bankruptcy court, as a court of equity, lacks jurisdiction to further a fraudulent purpose. Although this court’s opinion in
 
 In re Coastal Cable T.V., Inc.,
 
 709 F.2d 762, 764 (1st Cir.1983), seems to lend some credence for that premise, as will be discussed more fully when resolving the abuse of discretion issue, the bankruptcy court’s order did not result in “injustice or unfairness ... in the administration of the bankruptcy estate.”
 
 See id.
 
 The Trustee and the court both were fully aware of all of the allegations of fraud surrounding RSS’s acquisition of the Center’s mortgage and Smith’s alleged unethical involvement. Unlike the situation in
 
 Coastal Cable,
 
 the bankruptcy court here held several hearings on the record during which the issue was discussed extensively and during which the court even assumed the Jeremiahs’ success in the adversary proceeding against RSS and Smith. Nonetheless, after hearing testimony and evaluating all the facts, the court reached the considered conclusion that Ricci’s proposal was in the best interests of the estate. Thus, only then did the court “reluctantly” approve the sale and the compromise of the adversary proceeding.
 

 Moreover, although
 
 Coastal Cable
 
 requires that “there must be some relation — at least an arguable relation — between the Chapter 11 plan and the reorganization-related purposes that the Chapter was designed to serve,”
 
 see id.
 
 at 764, here the Jeremiahs presented neither a live plan of reorganization nor a comparable purchase offer for the property. As the bankruptcy court found, the Jeremiahs’ last-minute efforts and proposal were without merit; they just did not “cut it.” No one used the court to further fraudulent conduct; every effort was exerted to achieve the best interests of the estate. Thus, the issue here is not whether the court was being used to further a fraudulent purpose, and thus potentially lacked jurisdiction,
 
 [5]
 
 but did the court abuse its discretion in concluding that the sale and compromise— the only credible proposal on the table — were in the best interests of the estate.
 

 B.
 
 Sufficiency of the Record
 

 The Jeremiahs’ second argument is that the record is insufficient to demonstrate that the bankruptcy court made a thorough analysis of all the relevant factors and an informed,
 
 independent
 
 judgment. The record, however, is replete with evidence that the court made a thorough analysis, fully and patiently informed itself of the relevant facts, and carefully exercised independent judgment. It held at least five on-the-record hearings over many months, during which both parties repeatedly presented their respective positions to the court in detail. The court also provided the Jeremiahs, over the objections of the Trustee, with an extension of six weeks to give them an opportunity to
 
 *23
 
 present a workable solution before approving the sale and compromise.
 

 Moreover, the requirement that the court’s judgment be independent does not necessarily mean that it cannot match the judgment of the Trustee. We do not agree with the Jeremiahs that the judgment of the court cannot be independent unless it differs from the Trustee’s. Although the court accepted the proposal and reasoning of the Trustee, it did so only after searching hearings involving all parties and its independent conclusion that the proposal was in the best interest of the estate.
 

 Finally, though the court adopted the reasons proffered by the Trustee and even “welcome[d]” his business judgment, the court did summarize on the record its reasons. During the March 31st hearing, the court stated its conclusions in over one and one-half pages of recorded transcript which unmistakably demonstrated that it was exercising its own judgment, even though identical to the Trustee’s.
 

 We believe that the bankruptcy court informed itself of the relevant factors and established a sufficient basis on which it exercised its own independent judgment.
 

 C.
 
 Good Faith Purchaser Under Section 363(m)
 

 The Trustee correctly argues that under section 363(m) of the Bankruptcy Code this court cannot invalidate the Trustee’s sale to Ricci/SSC Realty if Ricci qualifies as a good faith purchaser. Although the Trustee argues that this is the case here, section 363(m) is not applicable to the facts of this case. “A ‘good faith’ purchaser is one who buys property in good faith and for value,
 
 without knowledge of adverse claims.” In re Mark Bell Furniture Warehouse, Inc.,
 
 992 F.2d 7, 8 (1st Cir.1993) (emphasis added) (citations omitted). Here, it is unquestionable that Ricci had knowledge of the adverse
 
 claim
 
 — i.e., the adversary proceeding-instituted by the Trustee against him. The Trustee cannot defeat the Jeremiahs’ claim by draping Ricci in the garment of a good faith purchaser when he clearly had notice and knowledge of the very same claim which lies at the heart of the disputed compromise before us. Notwithstanding that Ricci/SSC Realty is not a good faith purchaser under § 363(m), we believe that this conclusion does not affect our analysis.
 

 D.
 
 Did the Bankruptcy Court Abuse Its Discretion?
 

 On appeal from the district court, we independently review the bankruptcy court’s decision. The approval of a sale of a bankruptcy estate’s assets or a compromise of an adversary claim is within the sound discretion of the bankruptcy judge, and we will not upset it absent a clear showing that the bankruptcy judge abused his discretion.
 
 See Jeffrey v. Desmond,
 
 70 F.3d 183, 185 (1st Cir.1995) (internal citations omitted) (citing
 
 In re Anolik,
 
 107 B.R. 426, 429 (D.Mass.1989) (collecting cases));
 
 see also In re Thrifty Liquors, Inc.,
 
 26 B.R. 26, 28 (D.Mass.1982) (“The Court is loath to interfere with the Trustee’s business decision in regard to ... the propriety of the proposed sale.”).
 

 In deciding whether to approve a compromise of a lawsuit, the specific factors a bankruptcy court should consider include: “(i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.”
 
 See Jeffrey,
 
 70 F.3d at 185. The court’s consideration of these factors should demonstrate whether the compromise is fair and equitable, and whether the claim the debtor is giving up is outweighed by the advantage to the debtor’s estate. Although
 
 Jeffrey
 
 involved a Chapter 7 petition, courts routinely use these same principles in the Chapter 11 context.
 
 See, e.g., In re Pennsylvania Truck Lines, Inc.,
 
 150 B.R. 595, (E.D.Pa.1992).
 

 In the instant case, the record amply demonstrates that the court carefully weighed these factors in deciding to approve the sale and compromise. The court did not act mechanistically or impulsively. It realized that the Trustee assumed that the ad
 
 *24
 
 versary litigation would not be complex and that he probably would triumph. However, even if the Trustee were successful in the adversary proceeding, there was a substantial risk that RSS would retain a claim for “at least $200,000 against the estate,” the amount it had paid the New Bedford Bank for an assignment of the original mortgage. The Jeremiahs, by contrast, did not address this concern. Thus, because the Jeremiahs had no financial equity in the property and did not put forward a credible plan or offer, the dispositive issue for the court ultimately was whether the compromise and sale were in the best interests of the estate. The court reasonably concluded that they were.
 

 Although the bankruptcy court was faced with some unsavory and troublesome circumstances, in reality, it had no choice but to approve the proposal. Regardless of the court’s reluctance to approve a sale of the property to a purchaser of questionable repute and allegedly unethical conduct in the acquisition of the mortgage, any other decision might have been costly to the estate and an abuse of the court’s discretion. The Center had been in and out of Chapter 11 bankruptcy for approximately nine years. A trustee had been appointed and was running the Center — extraordinary in a Chapter 11 proceeding, see David G. Epstein, et al.,
 
 Bankruptcy,
 
 § 10.8, at 745 (1993) — because the Jeremiahs were in prison for dealing drugs out of the Center and unavailable to run it themselves. There appeared to be no end in sight.
 

 The Center also was woefully behind in its tax and utility payments. It had not made a real estate tax payment to the City of Providence since 1989 and was subject to real estate tax liens that were rapidly approaching $1 million. In addition, the Providence Water Supply Board and the Narragansett Bay Commission held $30,000 and $16,000 liens, respectively, on the property. The Center also has at least $850,000 to $1.5 million worth of environmental problems, is in deteriorating condition, with the roof alone needing between a half million and $1 million worth of repairs. In addition, prepetition, unsecured creditors held claims for approximately another $75,000. Although the Trustee, in operating the Center, had an illusory ' “profit” of $5,000 per month, this was achieved only by not-making payments on the mortgage, and by withholding payment of real estate taxes and any payments towards any of the Center’s prepetition outstanding obligations. Furthermore, it appears that much-needed repairs and capital improvements were ignored.
 

 Since the time the Jeremiahs sought Chapter 11 protection in 1994, they unfortunately never once put forward a credible proposal to reorganize the Center’s debts and to resume its operation. Even their so-called “proposal” submitted at the March 31st hearing lacked specific information regarding the value of the proposal, how it would be funded, or even the time frame during which it would be implemented. Furthermore, even the representations of the Jeremiahs’ counsel were lacking in specifics, referring mostly to undocumented and unverifiable monies and assets to be pledged in the future. Moreover, after notice by the Trustee of the proposed sale and compromise, no creditor objected. In the end, after marketing efforts, the targeting of other potential buyers, and the holding of discussions with others, Ricci made the only credible proposal. Faced with these facts, which are fully documented on the record, the court appears to have made the only reasonable choice available in approving the proposed sale and compromise.
 

 Finally, although the court fully adopted the reasoning of the Trustee in its final order and judgment, it articulated some of its own reasons for approving the plan during the March 31st hearing.
 

 In this ease I welcome the Trustee’s business judgment test. I think I’ve heard about as much as can be said in behalf of the Jeremiahs and the debtor in this case. This is a situation that no one in their right mind could possibly like if they’re looking at it from an objective position. It’s been — it’s been unpleasant. It’s been questionable. Ethics are totally missing— I don’t know when this — the whole thing originated, but it’s just a[sic] unsavory situation that has come down to the place where it is. [The debtor’s attorney’s] efforts to — in his client’s behalf — and nobody
 
 *25
 
 questions his right or his obligation to do that — would merely place us back where we were, moving along with the litigation, before the Trustee comes up with this offer. It’s the only show in town. It’s the only viable show in town.
 

 (App.141-42).
 

 In sum, the court made an informed, reasoned, and independent decision to approve, albeit reluctantly, the Trustee’s application to compromise and sale. We cannot conclude that it amounted to an abuse of the court’s discretion.
 

 III.
 

 Accordingly, we hold that despite the debt- or’s allegations of fraud and unethical behavior leveled at the purchaser, the bankruptcy court’s approval of the Trustee’s sale and compromise did not amount to an abuse of the court’s discretion. The court regrettably lacked a realistic alternative proposal and it fairly considered the merits of the proposal put forward by the Trustee and the realities of the estate’s desperate situation. The district court’s judgment affirming the judgment of the bankruptcy court is affirmed. Each side to bear its own costs.
 

 [1]
 

 . We use the ''Center" and the "Jeremiahs” interchangeably, although technically, the debtor is the Center only.
 

 [2]
 

 .
 
 See, e.g., State v. Ricci,
 
 472 A.2d 291 (R.I.1984).
 

 [3]
 

 . The Jeremiahs’ drug conviction subsequently was reversed on appeal.
 
 See State v. Jeremiah,
 
 696 A.2d 1220 (R.I.1997).
 

 [4]
 

 . There is some question regarding the efficacy of these waivers. Both Richardson and the United States Trustee allege that by soliciting these waivers, the debtor violated bankruptcy code section 1125's disclosure requirements.
 

 [5]
 

 . The bankruptcy court had jurisdiction over the Chapter 11 proceedings pursuant to 28 U.S.C. §§ 151, 157, & 1334. The district court had jurisdiction over the appeal from the bankruptcy court's final judgment and order, and this court has jurisdiction over the district court’s final judgment and order, pursuant to 28 U.S.C. § 158.
 
 See, e.g., In re: Andy Frain Servs., Inc.,
 
 798 F.2d 1113, 1124 (7th Cir.1986).