In re SILVER SPRING
CENTER, Debtor.

No. 94–12822.

United States Bankruptcy Court,
D. Rhode Island.

July 10, 2000.

18

Andrew S. Richardson, Boyajian, Harrington & Richardson, Providence, RI, for Chapter 11 Trustee.

Edgar L. Kelley, Boxford, MA, for Bruce Jeremiah and Andrew Jeremiah, General Partners of Silver Spring Center.

Edward G. Lawson, Pawtucket, RI, Local Counsel for Bruce Jeremiah and Andrew Jeremiah, General Partners of Silver Spring Center.

William F. Hague, Jr., Dick & Hague, Ltd., Johnston, RI, for S.S.C. Realty Associates, LLC.

Gary Donahue, Office of the U.S. Trustee, Providence, RI, for Assistant United States Trustee.

### DECISION AND ORDER

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Before the Court are: (1) Debtor's Motion for Reconsideration of Order Approving Application to Compromise and Notice of Sale; (2) S.S.C. Realty Associates,

LLC's[1] Motion to Vacate or Quash the Notice of Lis Pendens; and (3) the Jeremiah's "Emergency Motion to Uphold Lis Pendens and Lien Proceeds." The Debtor's Motion for Reconsideration was filed pro se by its two general partners, Andrew and Bruce Jeremiah ("the Jeremiahs"), who seek reconsideration of this Court's Order dated April 14, 1997, approving the Chapter 11 Trustee's Application to Compromise, and authorizing the sale of the Debtor's principal asset, a 500,000 square foot mill complex consisting of approximately 18 buildings. The Jeremiahs have already appealed the same Order to the United States District Court for the District of Rhode Island, which affirmed, and then to the First Circuit Court of Appeals which affirmed in a written opinion dated July 2, 1998. *See Jeremiah v. Richardson,* 148 F.3d 17 (1st Cir.1998). They now seek relief under Fed.R.Civ.P. 60(b), alleging that the Chapter 11 Trustee, Andrew Richardson, Esq., grossly mismanaged the mill complex by under-collecting rents and utilities to the extent of $420,000, and that had the Trustee done his job properly, by utilizing the Jeremiahs' billing methods, there would have been much more cash on hand when the compromise was proposed, and that the Court would not have been persuaded to approve the compromise and sale.

While we seriously questioned the good faith and the timing of the filing of the motion, the Jeremiahs nevertheless were given an extensive evidentiary hearing where they were represented by very experienced counsel. After the parties submitted post-hearing memoranda, and while the matter was pending under advisement, the Jeremiahs filed a notice of lis pendens against the property, inhibiting the current owner, S.S.C. Realty Associates, LLC (hereinafter "SSC"), from conveying or transferring the mill complex. On April 3, 2000, SSC filed a motion to vacate or quash the notice of lis pendens and on May 30, 2000, we held an evidentiary hearing on

the motion and took that issue under advisement, as well. For the reasons set forth below, the Jeremiahs' motion to reconsider is DENIED, and SSC's request to quash the notice of lis pendens is GRANTED.

### DISCUSSION

A detailed recital of the background of this matter, contained in the opinion rendered by the First Circuit Court of Appeals, is incorporated herein by reference, and need not be restated here. *See Jeremiah v. Richardson,* 148 F.3d at 19–22.

■ Fed. R. Bankr.P. 7060 incorporates Rule 60 of the Fed.R.Civ.P. into the bankruptcy process. Rule 60(b) establishes six mutually exclusive grounds for relief from an order or judgment, *see Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership,* 507 U.S. 380, 393, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). The rule states in relevant part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the

---

1. Movant S.S.C. Realty Associates, LLC, filed   as the owner of the Debtor's former property.

judgment, order, or proceeding was entered or taken.

Fed.R.Civ.P. 60(b).

■ Motions based on the grounds set forth in 60(b)(1), (2) or (3), must be brought "not more than one year after the judgement, order, or proceeding was entered or taken," Fed.R.Civ.P. 60(b), and although the rule requires that the motion be made within a reasonable time, there is an absolute bar to relief under subsections 1–3 if the motion is made after the expiration of one year. *U.S. v. Marin,* 720 F.2d 229, 231 (1st Cir.1983); *see also Pioneer Investment Servs.,* 507 U.S. at 393, 113 S.Ct. 1489 ("These provisions [Rule 60(b)(1) and Rule 60(b)(6) ] are mutually exclusive, and thus a party who failed to take timely action due to 'excusable neglect' may not seek relief more than a year after the judgment by resorting to subsection (6).")

■ A party may invoke the "catch-all" provision of Rule 60(b)(6) only when the other reasons specifically set out in Rule 60(b) do not apply.

A party may "not avail himself of the broad 'any other reason' clause of 60(b)" if his motion is based on grounds specified in clause (1)—"mistake, inadvertence, surprise or excusable neglect." Rather, "extraordinary circumstances" are required to bring the motion within the "other reason" language and to prevent clause (6) from being used to circumvent the 1–year limitations period that applies to clause (1). This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive.

*Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 863 n. 11, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988); *see also Cotto v. United States,* 993 F.2d 274, 277 (1st Cir.1993) (clause (6) of Rule 60 is designed as a catch-all, and "a motion thereunder is only appropriate when none of the first five subsections pertain. . . . [C]lause (6) may not be used as a vehicle

for circumventing clauses (1) through (5)"); *Pioneer Investment Servs.,* 507 U.S. at 393, 113 S.Ct. 1489 ("[t]o justify relief under subsection (6), a party must show 'extraordinary circumstances' suggesting that the party is faultless in the delay").

About Rule 60(b) motions, the First Circuit has stated:

Rule 60(b) invested the federal courts, in certain carefully delimited situations, with the power to "vacate judgments whenever such action is appropriate to accomplish justice." *Klapprott v. United States,* 335 U.S. 601, 614–15, 69 S.Ct. 384, 390, 93 L.Ed. 266 (1949). The rule attempts to harness a blend of centrifugal and centripetal forces. On the one hand, the rule must be construed so as to recognize the importance of finality as applied to court judgments. On the other hand, the rule must be construed so as to recognize the desirability of deciding disputes on their merits. The need to harmonize these competing policies has led courts to pronounce themselves disinclined to disturb judgments under the aegis of Rule 60(b) unless the movant can demonstrate that certain criteria have been achieved. In general, these criteria include (1) timeliness, (2) the existence of exceptional circumstances justifying extraordinary relief, and (3) the absence of unfair prejudice to the opposing party. . . . *See, e.g., Olle v. Henry & Wright Corp.,* 910 F.2d 357, 365 (6th Cir.1990); *United States v. Boch Oldsmobile, Inc.,* 909 F.2d 657, 660–61 (1st Cir.1990); *In re Pacific Far East Lines, Inc.,* 889 F.2d 242, 249 (9th Cir.1989).

*Teamsters, Chauffeurs, Warehousemen and Helpers Union, Local No. 59 v. Superline Transp. Co., Inc.,* 953 F.2d 17, 19–20 (1st Cir.1992).

■ While it was unclear by the Jeremiahs' motion under which subsection they were proceeding, their attorney responded in his final argument that they seek *relief* under Rule 60(b)(6). With that clarification, based upon the entire record in this

case, and for the following reasons, we find that the motion is untimely because it was not made within a reasonable time.

As we all know by now, the thrust of the Jeremiahs' motion is the Trustee's alleged under-billing of electrical service to tenants. The mill complex receives its electricity in bulk from the Narragansett Electric Company and receives one bill for all electrical service supplied to the property, and it is the Debtor's responsibility to charge each tenant its aliquot share of the cost of electricity. Bruce Jeremiah testified that there are 172 meters in the complex and that when he ran the center, he read each meter monthly and input the information into a computer system which automatically calculated the bill for each tenant. He testified that all tenants were charged eighteen cents per kilowatt hour, that from the information he had, the Trustee also charged eighteen cents per kilowatt hour, and that the problem with the Trustee's management is that the Trustee under-billed kilowatt hours to certain tenants. He complained that without more detailed records from the Trustee, he cannot pinpoint the problem more specifically.

The Jeremiahs allege that the Trustee's under-billing of electricity from July 1995 through February 1998 cost the estate in excess of $400,000. When questioned as to why they took no sooner formal action against the Trustee, they basically blamed their attorneys and complained that they did not have the rent rolls and other records necessary to support their allegations.

In rejecting these excuses, we find that the Jeremiahs did not bring the instant motion within a reasonable time, and that any delay was caused exclusively by them or their agents. The evidence is that the Jeremiahs had concerns about the Trustee's billing practices as early as March 1997, even prior to the hearing on the Application to Compromise, that they referenced the problem generally in their opposition to the compromise, and the circuit court so noted in its opinion. *See Jeremi-*ah *v. Richardson,* 148 F.3d at 20 ("The Jeremiahs dispute the Trustee's characterization of the poor financial health of the Center, and raise questions about the Trustee's rent collection and accounts receivable figures, which they contend would show that the Center was in better condition than that painted by the Trustee"). Andrew Jeremiah testified that by Thanksgiving 1997, he knew there was a problem with the billing of electricity by the Trustee, and this testimony is echoed by Bruce Jeremiah, who stated that before January 1997 he knew there was a problem with the meter readings and that he wanted his attorneys to obtain the meter readings and tenant billing records from the Trustee.

Although they had enough information in hand to make them suspicious of and hostile to the Trustee, the Jeremiahs took no formal action to stop or correct any perceived wrongdoing. Instead they now blame their own attorneys for failing to obtain the documents they say they need to properly present the matter to the Court. It was not until October 30, 1998, long after the motion to compromise had been fully decided, that Bruce Jeremiah filed a *pro se* Motion to Compel Production of Records. After the matter was set for hearing, one Jeremiah attorney reported that the Trustee had produced documents that "should have satisfied" the Jeremiahs. However, through a second attorney, Bruce continued to press the motion to compel. After hearing, the motion was denied on the ground that no controversy was pending to warrant the requested discovery, which was made more than eighteen months after the application to compromise was approved. And again, the Jeremiahs seek to avoid responsibility by shifting blame to their attorneys. As for those arguments dealing with the actions of their chosen legal representatives, we direct the Jeremiahs to the case of *Link v. Wabash R. Co.,* where the Supreme Court stated:

Petitioner voluntarily chose this attorney as his representative in the action,

**22**

and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney."

370 U.S. 626, 633–634, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) (*quoting Smith v. Ayer,* 101 U.S. 320, 326, 25 L.Ed. 955 (1880)).

Given the long history of this matter and the extent to which the Jeremiahs have been over-indulged, it is ludicrous to be dealing with this motion almost three years after the expiration of *all* deadlines. For the reasons given above, and being clearly time-barred, the motion to reconsider is DENIED.

■ Nevertheless, even if we were to find the Jeremiahs' motion to be timely, they have not demonstrated the "extraordinary circumstances" required to vacate the judgment approving the compromise and sale of the real estate. *See Pioneer Investment Servs.,* 507 U.S. at 393, 113 S.Ct. 1489. The Trustee had his property manager, Peter Scotti, meet with the Jeremiahs to inquire as to how they managed the complex, and Scotti stated that he followed the procedure recommended by the Jeremiahs in calculating power usage. As proof of under-billing by the Trustee, the Jeremiahs point to the fact that gross receipts under their reign for 1994 was $550,000, while 1995 gross receipts were $365,000 under the Trustee's control. This argument is not supported by the record. The undisputed facts are that the Jeremiahs operated the center through mid-July 1995, that the Trustee took over for the rest of the year, and that the decline in income was already in place while under the Jeremiahs' control. During their tenure in 1995, the Jeremiahs collected $195,000 and the Trustee collected $170,000 for the balance of the year. The

Trustee testified that he lost some tenants during the period, which accounted for some of the drop in income.

When the Trustee learned of the Jeremiahs' complaints concerning the billing issue, he contacted his manager who satisfied him that tenants were being billed correctly, and when he received complaints from tenants concerning their electric charges, the expert he hired to evaluate the accuracy of the meters found that they were operating properly. The Trustee stated that he responded to all requests of the Jeremiahs' lawyers, to the extent that he gave one of them unlimited and unrestricted access to twelve cartons of documents in his office.

Based on all I have seen and heard, I find that none of the Jeremiahs' claims of Trustee mismanagement are supported by the evidence. Their own version of the nature of the alleged under-billing conflicts with that of their expert, John Kelleher, who focused on the Trustee not charging tenants a proper mark-up for electricity, while the Jeremiahs complain that the Trustee under-billed kilowatt hours. In the end, the Jeremiahs' motion is a misguided and clumsily executed attempt to regain control of their former property—at *any* cost. In, hopefully, putting this matter finally at rest, we resolve all disputed questions of fact against the Jeremiahs, and find that the Trustee is not guilty of any of the misdeeds alleged by the Jeremiahs. Accordingly: (1) the Motion to Reconsider is untimely; (2) on the merits it is totally unsupported by any credible evidence; and (3) it is DENIED, with prejudice.

*The Lis Pendens:*

■ While in normal circumstances it would follow, based on the substantive rulings above, that the Lis Pendens should be summarily quashed or vacated. However, this case is far from ordinary and some elaboration on the issue is therefore in order.

On April 3, 2000, SSC filed its motion to vacate or quash the notice of lis pendens filed against the property by the Jeremiahs. In response, the Jeremiahs, through their attorney, filed an "Emergency Motion to Uphold Lis Pendens and Lien Proceeds" wherein they allege, inter alia, that SSC is planning to sell the complex to the Home Depot enterprise for "many millions of dollars." *See* Emergency Motion to Uphold, Docket No. 302, p. 1. They go on to state that: "Sources have related a sale price of approximately 3.5 million dollars.... A recent search has found a negotiated reduction in the property taxes without any substantial payments to the sum of $550,000 from $1,100,000.00. The unjust enrichment to the Ricci and Smith conspiracy will be approximately $3,000,000.00." *Id.* at p. 2.

On May 17, 2000, in response to these extraordinary allegations, we held an initial hearing on both SSC's motion and the Jeremiahs' "Emergency Motion," where it became obvious early on that the actual purchase price for the complex was $1.8 million and that valid encumbrances on the property extinguished the possibility of any substantial payment to SSC. Nevertheless, with no supporting evidence, the Jeremiahs pressed their assertion that the real estate taxes were less than half the amount SSC was claiming, leaving more equity than what appeared on record, and so the hearing was continued to May 30, 2000, to take evidence on this issue. At the continued hearing, the Jeremiahs produced copies of "Counter Bills" obtained from the City of Providence Assessor's Office, purporting to show that the taxes due on the property were $579,000. The attorney for SSC questioned Deborah Lapatin, the tax assessor for the City of Providence, who testified that, with interest, the tax due the City exceeded $1.1 million, and that there was no compromise or deal between SSC and the City. Lapatin also stated that Counter Bills do not display or itemize the interest due, but that all Counter Bills issued by the City do state "Interest is not shown." She had no explanation why the Counter Bills proffered by the Jeremiahs did not contain that standard language.

SSC also called Bruce Jeremiah, who likewise was unable to explain why the copies[2] of Counter Bills he submitted to the Court did not contain the language "Interest is not shown." In the circumstances, the hearing was interrupted again and the Jeremiahs were ordered to produce the original Counter Bills they obtained from the City on March 16, 2000. After a short recess Bruce Jeremiah returned with the original Counter Bills (Exhibit E), and with only one exception,[3] at the bottom of each Counter Bill is the statement:

> NOTE: NO INTEREST IS SHOWN ON THIS STATEMENT. INTEREST WILL BE APPLIED TO ALL PAST DUE BALANCES AT TIME PAYMENT IS MADE.
>
> TAX _____ INTEREST _____
> CHARGES _____

When confronted as to why the copies he submitted earlier did not contain this language, Bruce explained that he uses his computer scanner as a copy machine because he does not own a separate copier, and that as he scanned the originals into his computer, it appears that the scanner "cut off this language at the bottom of each page." In support of this explanation, he submitted Exhibit F—the documents printed by his computer from the scanned Counter Bills. He stated that he was only concerned with the "numbers" on the Counter Bills, and since the scanned copies match the original, he was satisfied as to their accuracy.

---

**2.** Why the original documents were not brought to court in the first place, becomes apparent very shortly, below.

**3.** We are not sure why this one bill does not contain the same language as the other bills. We note, however, that the bill seems to differ from the other bills in that it does not contain an address for the property being taxed.

**24**

We find that Bruce Jeremiah's testimony is a fabrication, and that he offered altered documents with the intent to deceive the Court and the parties to this litigation. The words "NOTE: NO INTEREST IS SHOWN ON THIS STATEMENT..." appear at a different place on each bill, and we find it impossible to understand, and cannot believe how Bruce's scanner could consistently cut off the (to him—offensive) language, unless it was done intentionally. If the scanner cut off text at a given point due to the size of the document, as explained by Bruce Jeremiah, the deletion would begin at the same place on each Counter Bill. That is not what happened. On the original bills, some numbers run close to the bottom of the page, and then the questioned language appears. On other bills, the omitted language is located about half way down the page. Yet Bruce's scanned copies omitted the questioned language, no matter where it appeared on the original document. Without question, and without the need for expert testimony, we find that Bruce Jeremiah intentionally and surreptitiously altered the documents in question, and reprinted the Counter Bills, as deleted, with the intent to mislead. Bruce's motivation is clear, in that it was the only way he could argue to the Court that SSC had cut a deal on taxes with the City and that SSC was about to profit outrageously on resale of the property. He knew that the City's tax claim, with interest, exceeded $1.1 million, and knew he had to satisfy the Court that the City forgave the approximately half a million dollars in interest. By submitting the altered Counter Bills, Bruce was able to argue that the taxes were reduced and that he had City tax bills to prove it. He apparently was operating on the theory that a lie is as good as the truth, if you can get somebody to believe it.

 In one of the most flagrant but inept attempts at court deception ever seen in this Court, SSC's motion to vacate the lis pendens is GRANTED, the Jeremiahs' motion to uphold the lis pendens is DENIED, and SSC's counsel is awarded its fees and costs incurred in having to bring the instant motion and to oppose the Jeremiahs' motions for reconsideration and to uphold the lis pendens. If the parties cannot agree as to the amount of said fees and expenses,[4] a hearing will be scheduled.

Enter judgment consistent with this opinion.

---

4. We will not get into the apportionment of this compensatory sanction between the Jeremiahs and their counsel. That is best left to the parties, as only they know who is most responsible for the actions described herein, or whether it was a joint venture. Therefore, this sanction is assessed jointly and severally against the Jeremiahs and their counsel.