[NOT FOR PUBLICATION--NOT TO BE CITED AS PRECEDENT]

# United States Court of Appeals
## For the First Circuit

No. 99-2034

IN RE: JFD ENTERPRISES, INC.,

Debtor.
_____

JOSEPH F. DISTEFANO; PATRICIA A. DISTEFANO,

Appellants,

v.

PETER M. STERN; EUGENE B. BERMAN; ROGER A. DIALESSI,

Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael  A. Ponsor, U.S. District Judge]

Before

Stahl, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lynch, Circuit Judge.

G. Eric Brunstad, Jr., with whom Patrick J. Trostle and Bingham Dana LLP were on brief, for appellants.
Kerry David Strayer, with whom Kamberg, Berman, P.C. was on brief, for appellee Berman.
Kevin C. Giordano, with whom Keyes and Donnellan, P.C. was on brief, for appellee Stern.

David J. Martel, with whom Doherty, Wallace, Pillsbury and Murphy, P.C. was on brief, for appellee Dialessi.

MAY 1, 2000

**STAHL, Circuit Judge**. Plaintiffs-appellants Joseph and Patricia DiStefano are shareholders and creditors of JFD Enterprises, Inc. ("JFD").[1] They appeal a grant of summary judgment in favor of defendants-appellees Peter Stern, Eugene Berman and Roger Dialessi (the "appellees"). The DiStefanos allege that during the course of JFD's reorganization under Chapter 11 of the Bankruptcy Code, the appellees violated various fiduciary duties owed to them. These breaches, the DiStefanos contend, caused them to suffer financial losses on advances they had extended to JFD and prevented their recovery on other liens they held against the company's assets. We affirm.

## Background

Prior to the commencement of bankruptcy proceedings, JFD operated a liquor store under the trade name Century Liquor Mart ("Century") in West Springfield, Massachusetts. Joseph DiStefano managed the business. In February 1989, he personally

---

[1]Joseph DiStefano is an unsecured creditor, while Patricia DiStefano is an undersecured creditor.

-2-

guaranteed about $300,000 of indebtedness owed by JFD to the Park West Bank and Trust Company (the "Bank").

Century was a successful operation until about 1990. After that, its business declined, probably due in large part to the closure of a nearby bridge and a consequent reduction in traffic to the shopping center of which the store was a part. On June 10, 1993, JFD filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Massachusetts. As part of the Chapter 11 proceeding, an Official Unsecured Creditors' Committee ("Committee") was appointed. With the bankruptcy court's permission, the Committee hired Kamberg, Berman, P.C., and appellee Eugene Berman in particular, as its counsel.

It appears from the record that when JFD filed for bankruptcy, its indebtedness to the Bank totaled approximately $275,000. On July 30, 1993, Berman and counsel for the Bank negotiated a stipulation agreeing that the Bank held an enforceable first security interest in all of JFD's personal property and cash. The bankruptcy court approved this stipulation on August 18, 1993. Subsequently, during the autumn of 1993, Patricia DiStefano, JFD and the Committee also agreed that Mrs. DiStefano possessed an enforceable claim against the JFD estate in the amount of $40,000; that her claim was secured

-3-

by JFD's inventory, proceeds, and accounts receivable; and that it was junior to the Bank's interests.[2]  The bankruptcy court approved this stipulation on November 17, 1993.

In the meantime, on September 24, 1993, the Committee had filed a motion to convert the case to a Chapter 7 liquidation.  The Committee alleged that JFD had lost $475,000 between August 1990 and May 1993, that it was poorly managed, and that it faced continued financial losses.  On October 12, perhaps in response to the Committee's efforts, Joseph DiStefano entered into a stipulation (the "October 12 Stipulation") pursuant to which he ceded management responsibility for Century to Roger Dialessi and the Committee withdrew its conversion motion.  But immediately before this agreement was memorialized and approved by the bankruptcy court, the Bank filed its own motion to convert the case to a Chapter 7 action, charging that the Committee unlawfully had installed new JFD management without regard to the safeguarding of the Bank's interests.  The Bank also complained that JFD's inventory had declined

---

[2]The stipulation also provided that if Mrs. DiStefano received less than $25,000 on her claim, she would have a junior security interest in JFD's liquor license for the difference between the amount paid and $25,000.

-4-

substantially since the bankruptcy proceeding had commenced, thus reducing the security of its lien.[3]

On October 29, 1993, the United States Trustee ("UST") objected to the October 12 Stipulation and filed a motion for the appointment of a Chapter 11 Trustee, claiming that Dialessi was unlawfully acting as a de facto trustee. On November 10, 1993, however, JFD, the Committee, the Bank, and the UST entered into a stipulation (the "Appointment Stipulation") providing that Dialessi would be appointed as the Chapter 11 Trustee and limiting his pay to $600 per week for "services rendered in the operation of the business of the Debtor." That same day, the same parties except for the UST entered into another stipulation that accorded the Bank a perfected, enforceable security interest in JFD's liquor license. As part of this agreement, the Bank agreed both to withdraw its motion to convert the proceedings into a Chapter 7 action and not to seek such a conversion in the future so long as certain stated conditions were met. The bankruptcy court approved both stipulations.

---

[3]At around the same time, the Bank froze JFD's account, which contained about $40,000, and refused to grant Dialessi check-signing authority on the account. JFD subsequently brought an adversarial action seeking an order requiring the Bank to allow access to its account. The Bank relented, allowing Dialessi access.

The parties' stipulation notwithstanding, and for reasons that are not clear, appellee Stern was appointed as trustee instead of Dialessi.[4] Dialessi continued to manage Century.

On May 31, 1994, Stern, acting as Trustee, moved to sell Century's personal property, including its liquor license, for $275,000, including a $20,000 "carve-out" to be paid to the bankruptcy estate. By this point, however, Century's liquor license was on a Massachusetts Alcoholic Beverage Control Commission ("ABCC") payment "delinquent list" pursuant to Mass. Gen. Laws ch. 138, § 25. That provision states that delinquent licensees may only make cash purchases from liquor wholesalers. Moreover, the statute's requirements continue to apply even if the license is transferred. Thus, the Committee objected to the asset sale, arguing that the license could only be sold subject to the bar against purchases made other than for cash. The court ultimately rejected the proposed sale on the ground that it would not substantially benefit the estate.

---

[4]Citing Berman's deposition testimony, the appellants suggest that the UST opposed Dialessi's appointment. As noted above, however, the UST was a party to the Appointment Stipulation.

As Century's general manager, Dialessi engaged in various activities relevant to this appeal. These were described by the district court as follows:

> Dialessi . . . discontinued the use of a computerized cash register system capable of monitoring inventory levels. He contends that such action was prompted by Mr. DiStefano's failure to record beer and wine purchases in the system, which he claims resulted in the system generating inaccurate inventory reports. Additionally, Dialessi sold some of Century['s] wine inventory to another liquor store owner for approximately $2,000. Although Mr. DiStefano originally maintained at his deposition that the value of the wine sold was $25,000, cross examination revealed that this position was based on what another employee had allegedly told him. He later conceded that the value of the wine sold was approximately $4,000, which is more consistent with Dialessi's affidavit, which stated that the liquor was worth $3,200. Moreover, Dialessi failed to pay Massachusetts withholding taxes, but personally resolved all claims by the government at no expense to JFD. Lastly, Dialessi, due to JFD's cash shortage, paid employees out of an account in which proceeds from JFD's lottery ticket sales were deposited.

DiStefano v. Stern, 236 B.R. 112, 115 (D. Mass. 1999).

On August 26, 1994, Stern moved to convert the case to a Chapter 7 proceeding. The court allowed his motion and appointed Stern as the Chapter 7 Trustee. On December 20, 1994, Stern sold Century's liquor license for $100,000; he sold JFD's personal property separately for about $31,000. In June 1995,

-7-

the court ordered the ABCC to approve the license's transfer free and clear of its delinquent status. Due to the disparity between the value of the Bank's loan, which, at that point, exceeded $300,000, and the price for which the JFD assets were sold, $131,000, Mr. DiStefano was required to pay $50,000 on his guaranty (pursuant to a settlement with the Bank), and Mrs. DiStefano failed to recover anything on her undersecured interest in the JFD estate.

On February 14, 1997, the DiStefanos filed an action in the Massachusetts Superior Court against Stern, Berman, Dialessi, the Bank, and the Bank's attorney.[5] The DiStefanos alleged that the appellees behaved negligently in their stewardship of JFD and breached fiduciary duties owed to them as shareholders and creditors of JFD.[6] On March 11, 1997, Berman had the case removed to the bankruptcy court as a "core proceeding" in JFD's bankruptcy case.

Eventually, the appellees moved for summary judgment. They claimed, inter alia, that the DiStefanos lacked standing to

---

[5]The Bank and its counsel subsequently were dropped from the case.

[6]The DiStefanos contended that Stern and Dialessi owed them fiduciary duties by virtue of their positions as bankruptcy trustee and Century's manager, respectively, and that Berman owed such a duty by virtue of his de facto control of JFD during the Chapter 11 proceedings.

-8-

pursue their claims and that their own behavior did not result in any harm to the DiStefanos. The bankruptcy court granted summary judgment to all the appellees on all counts. The court determined, in pertinent part, that the DiStefanos indeed lacked standing to bring their claims and that, irrespective of standing, the DiStefanos would be unable to prove that the appellees' conduct caused them any damages.

The DiStefanos appealed the bankruptcy court's ruling to the district court. That court affirmed the grant of summary judgment, grounding its decision entirely on the DiStefanos' inability to prove that their losses were caused by the appellees' conduct. The DiStefanos again appeal.

## Discussion

The question whether a genuine issue of material fact exists, such that a grant of summary judgment must be reversed, presents a legal issue subject to de novo review. See Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 763 (1st Cir. 1994). We view the facts in the light most favorable to the nonmoving party, granting all reasonable inferences in that party's favor. See Barreto-Rivero v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999). Even so, summary judgment is appropriate if the nonmovant's evidence is "merely colorable, or is not significantly probative." Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 249-50 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252. We will not "accept the nonmovant's subjective characterizations of events, unless the underlying events themselves are revealed." Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37 (1st Cir. 1999); see also Liberty Lobby, 477 U.S. at 256; Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 6 (1st Cir. 1998).

Given these standards, we believe summary judgment in the appellees' favor was appropriate on the grounds identified by the district court: an absence of harm attributable to the appellees' conduct. We explain by discussing separately the two classes of harm the DiStefanos have identified: (1) losses relating to JFD's declining value and (2) the legal fees the DiStefanos purportedly incurred defending an action brought by the IRS because of Dialessi's failure to withhold employee income taxes as manager of Century.

## I. Losses Associated with the JFD Estate's Declining Value

The DiStefanos assert various arguments against Dialessi, Berman and Stern, most of which boil down to the following contentions: (1) the DiStefanos were creditors and

shareholders of JFD; (2) Dialessi and Stern, who held appointed positions in JFD's bankruptcy proceedings, and Berman, who acted as a "de facto" bankruptcy trustee, owed the DiStefanos fiduciary duties in the latter's capacity as JFD's creditors and shareholders; (3) each appellee breached his fiduciary duty to the DiStefanos; (4) as a proximate consequence of these breaches, JFD lost substantial value before the ultimate sale of its assets, resulting in the DiStefanos' losses on Mrs. DiStefano's lien as outlined in the November 17, 1993 stipulation and on Mr. DiStefano's guaranty of JFD's indebtedness to the Bank. Although the DiStefanos may have suffered other losses, such as those associated with their equity interest in JFD -- which was ultimately worthless -- those losses are not here at issue, because the DiStefanos could only have avoided those losses if the JFD estate had first satisfied all claims of JFD's general creditors.

The DiStefanos' claims cannot survive summary judgment because they have failed to adduce adequate evidence of causation linking their losses to the appellees' conduct. That is, even if we were to assume arguendo that the appellees each owed a fiduciary duty to the DiStefanos, that they each breached that duty, and that JFD's value declined precipitously during the course of its bankruptcy proceedings, the DiStefanos have

-11-

not submitted enough evidence indicating a causal link between the breaches and the losses to survive summary judgment. Correlation alone, here as elsewhere, does not prove causation. We explain with respect to each allegation made in support of the DiStefanos' claims.

## A. Timing of the Sale

The DiStefanos' principal allegation in support of their claims relates to the timing of the sale of Century's assets. As noted above, in May of 1994, Stern filed a motion seeking approval to sell JFD's business to a third party in exchange for $275,000. The DiStefanos contend that at the time of that proposed sale, the Bank's claim was valued at $294,000. If the sale had proceeded, they argue, the Bank would have recovered all but $19,000 of its total claim from JFD in liquidation. At the very least, Mr. DiStefano's exposure under the loan guaranty would have been far less than the $50,000 for which he ultimately was held responsible.[7] Berman, however,

---

[7]The DiStefanos also theorize that there was a "likelihood that other bidders would have offered more, leaving (at most) a small deficiency for the Bank." This price increase presumably would have further reduced the DiStefanos' exposure and might even have resulted in a surplus that would have inured to the benefit of an undersecured creditor such as Mrs. DiStefano. However, Stern's motion specified the $275,000 price and did not on its face provide for any further bidding process. Even if it had, we would be unwilling to rely upon speculation that a higher price would have been reached. "[C]onclusory allegations, improbable inferences, and unsupported speculation

-12-

objected to the sale.  On July 13, 1994, the court held a hearing on the motion and Berman's objection.  The court ultimately refused to allow the sale.  The DiStefanos contend that Berman's objection to the sale constituted a breach of fiduciary duty to the estate[8] and a proximate cause of their subsequent losses.

The DiStefanos' argument regarding the aborted sale falters, however, because the discretion and authority to allow or disallow the sale lay, of course, not with any of the appellees, but rather with the court.  See, e.g., 28 U.S.C. § 157(b)(2)(N).  It is true that the court might not have intervened at all save for Berman's objection.  See, e.g., 11 U.S.C. § 363(b)(1) (requiring "notice and a hearing" before sale of estate property outside the ordinary course of business); id. § 102(1)(B) (defining "notice and a hearing" in a manner allowing a sale without any hearing where no party requests one); In re Crowell, 225 B.R. 334, 335 (Bankr. E.D. Mich. 1997)

_____

. . . are insufficient to establish a genuine dispute of fact." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (internal quotation marks and citations omitted).

[8]Berman, they contend, usurped the trustee's role and thus owed the estate a fiduciary duty.  In opposing the sale, they argue, Berman breached that duty by elevating the interests of one particular subset of JFD creditors -- a group of liquor wholesalers who held claims for unpaid bills -- over the interests of other creditors.

("In the absence of objections to a proposed sale, so long as there is compliance with the notice and a hearing mandate by the trustee . . . judicial involvement is not required and approval by the bankruptcy judge of the sale is unnecessary."). But Berman's intervention did not itself doom the asset transfer; after all, the court could have permitted the sale if it believed that that course of action was in the estate's best interest. See Jeremiah v. Richardson, 148 F.3d 17, 24 (1st Cir. 1998). In this case, the court determined that that was not so. In light of the court's intervening exercise of discretion, even if Berman's objection constituted a breach of some duty to the DiStefanos, that breach did not "cause" harm, for it was the action of the court which doomed the sale.

Nor may the DiStefanos rest their case on the allegation that the appellees should have effected an earlier sale of JFD's assets to insure that those assets would cover the Bank's secured loan and the interests of other creditors as well. It is not our role to second-guess a trustee's determination not to sell an estate's assets at a given point in time so long as that determination reflects the trustee's business judgment:

> The Bankruptcy Code designates the trustee
> as the representative of the estate. The
> trustee has ample discretion to administer
> the estate, including authority to conduct

-14-

> public or private sales of estate property. Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.

In re WPRV-TV, Inc., 143 B.R. 315, 319 (D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992); see also In re Bakalis, 220 B.R. 525, 531-32 (Bankr. E.D.N.Y. 1998) (noting discretion accorded to trustee with regard to sale of assets); In re Thinking Machs. Corp., 182 B.R. 365, 368 (D. Mass.) (emphasizing "the high degree of deference usually afforded purely economic decisions of trustees"), rev'd on other grounds, 67 F.3d 1021 (1st Cir. 1995). As the district court pointed out, the DiStefanos presented no evidence regarding the price JFD's assets would have commanded at any earlier sale and no evidence that JFD's demise was or should have been a foregone conclusion from the opening months of JFD's bankruptcy.[9] Absent such evidence, there would have no basis upon which to doubt a trustee's business judgment.

**B. Causation of Harm**

---

[9]Indeed, any suggestion that JFD's assets should have been sold earlier than May 1994 presupposes that the trustee should have known that the value of those assets would necessarily decline over time. That presupposition conflicts with the DiStefanos' assertion that JFD's losses proximately were caused by particular actions or inactions on the part of the appellees.

-15-

We turn, then, to whether, considering the respective value of JFD and of the Bank's loan when the assets were actually sold, the DiStefanos can demonstrate that their harms were caused by the appellees' misdeeds. They cannot.

The DiStefanos suggest that the appellees' mismanagement resulted in JFD's losses, and hence in their own. But the record makes clear, and there is no dispute, that JFD was hemorrhaging value long before its bankruptcy filing. In the three years preceding JFD's bankruptcy, while Century was under Mr. DiStefano's management, the business lost a total of $403,874. When JFD initiated bankruptcy proceedings, the bankruptcy schedules indicated assets of $549,331.37 and liabilities of $1,100,662 -- a negative net equity of over $500,000.

By the time JFD's liquor license and personal property were sold, the value of its assets was about $131,000. The amount of the Bank's loan, meanwhile, had increased to over $300,000. As we have stated, the harms claimed by the DiStefanos consist of Mr. DiStefano's $50,000 liability on his guaranty of JFD's loan from the Bank and Mrs. DiStefano's forfeited junior interest in JFD's assets. These losses could have been "caused" by the appellees' actions only if JFD's assets, but for those actions, would have exceeded $250,000 at

the time of the sale -- that is, if those actions caused at least $119,000 in lost value. Otherwise, Mr. DiStefano would have remained liable for the entire $50,000 he ultimately paid on his guaranty, and the DiStefanos would have suffered the same harms about which they now complain.[10]

The DiStefanos invite us to disregard JFD's prepetition losses and to assume that any decline in JFD's value following the initiation of bankruptcy proceedings must be attributed to the appellees' purported malfeasance. This we cannot do. The DiStefanos bear the burden of demonstrating that any particular losses were attributable to the appellees. We thus review the appellees' specific "misdeeds" to determine the most generous loss figures that the DiStefanos might be able to prove at trial.

The DiStefanos first contend that Century's business declined precipitously during Dialessi's tenure as its manager.

---

[10]As noted, the Bank's loan in fact exceeded $300,000. Although the loan's balance was appreciating as time passed, we will use the $300,000 figure as the basis for our analysis. Greater indebtedness to the Bank would only have required that the appellee's acts caused even more damage in order for the DiStefanos to merit relief because the total difference between the Bank's claim and JFD's value would be correspondingly greater. Thus, our assumption of a $300,000 secured interest redounds in the DiStefanos' favor. Even assuming that the Bank's loan amounted to "only" $300,000, the DiStefanos cannot prove that their claimed losses resulted from the appellees' behavior.

As the district court noted, however, given JFD's steep pre-bankruptcy decline, the DiStefanos would be unable to link post-bankruptcy losses to Dialessi's conduct, absent specific allegations of mismanagement:

> [T]he overwhelming and undisputed facts show that Century Liquor was in severe financial distress long before Dialessi became manager . . . . Following the commencement of the bankruptcy proceeding and the appointment of Dialessi as manager, the record does not reflect any significant decline in business different from the preexisting downward spiral that ended in bankruptcy.

DiStefano, 236 B.R. at 117-18.

The DiStefanos next charge that Dialessi discontinued the use of Century's computerized inventory monitoring system. However, they offer no proof whatsoever linking this discontinuance to any decline in JFD's value.

Mr. and Mrs. DiStefano also allege that Dialessi paid himself $150 more per week than the Appointment Stipulation authorized. As the bankruptcy and district courts noted, even if this allegation were proven, the resulting loss would not exceed $7000.

The DiStefanos further have asserted that Dialessi sold a large quantity of premium wines for an unacceptably low price. Mr. DiStefano first indicated that these wines were worth $25,000, but later conceded they probably were worth only

-18-

approximately $4000. The evidence indicates that they were sold for about $2000. Giving the DiStefanos the (generous) benefit of the doubt, we will assume for present purposes (without finding) that the DiStefanos could prove that the wines were, indeed, worth $25,000. Thus, we will assume a net loss of $23,000 arising from the sale of these wines.

Next, the DiStefanos accuse Dialessi of neglecting to pay Massachusetts employee withholding taxes. Joseph DiStefano has testified, however, that he never was held personally liable for the taxes and that attachments to secure their payment were lifted. Neither was the estate held liable. Rather, Dialessi remedied the tax problem himself, with no direct financial consequences inuring either to the DiStefanos or to JFD.[11]

Finally, the appellants note that Dialessi paid employees from an account dedicated to the proceeds of Century's lottery ticket sales. They fail, however, to specify how this action -- even if improper -- might relate to the decline in JFD's value.

It is evident that the DiStefanos cannot escape summary judgment, because they have no meaningful evidence that the appellees' misconduct resulted in a loss of $119,000 or more in

_____

[11]The DiStefanos contend that this failure required them to incur legal fees to defend an action brought by the Internal Revenue Service. We address this argument below in Part II.

-19-

JFD's value. Even on summary judgment, we cannot credit unsupported conjecture and speculation linking JFD's decline under the appellees' stewardship to their actions, particularly when JFD had endured similar deterioration in the period preceding its bankruptcy. Even a generous accounting of the appellees' specific misdeeds suggests that the DiStefanos could prove, at most, a $30,000 loss resulting from those actions.[12] This figure does not even approach the $119,000 loss the DiStefanos would need to prove in order to establish causation. Thus, the bankruptcy and district courts properly concluded that the DiStefanos would be unable to prove that the appellees caused them any harm.

## II. Losses Associated with the IRS Suit for Taxes Not Withheld

The DiStefanos also argue that "after Dialessi failed to pay certain payroll taxes," Mr. DiStefano "was forced to defend himself against" a government claim, and that this cost would not have been incurred "but for Appellees' misconduct." This claim is distinct from their claim that the failure to

---

[12]This figure comprises a $7000 loss arising from Dialessi's excessive salary and a $23,000 loss stemming from Dialessi's transfer of the premium wines. Of course, if we adopted the more likely loss figure for the latter -- $4000 in value minus the $2000 price, for a net $2000 loss -- the maximum loss figure the DiStefanos could prove would be closer to $9000.

withhold taxes contributed to JFD's deteriorating value, <u>see</u> Part I, <u>supra</u>, but it, too, fails.

First, irrespective of whether Stern could have breached his fiduciary duties to the DiStefanos by forcing them to incur legal fees, the DiStefanos have not submitted sufficient evidence to conjure a "genuine issue" of fact with respect to those fees. As noted above, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Liberty Lobby</u>, 477 U.S. at 252. Here, there is not. The record evidence the DiStefanos cite regarding this issue consists entirely of two off-hand remarks Mr. DiStefano made at his deposition. In one instance, referring to Dialessi's failure to pay income tax withholdings, opposing counsel asked DiStefano, "So, [that failure] hasn't caused any damage to you?" He responded, "Yes, it did. It caused me tremendous emotional distress, legal fees." Later, counsel sought to confirm that any attachments filed on the DiStefanos' property as a result of Dialessi's actions ultimately were removed. DiStefano responded, "To the best of my knowledge, after a long period of time and numerous legal fees." These remarks constitute the entirety of the evidence on this matter. There is no indication of the

-21-

magnitude of the fees referenced, nor of the precise context in which they were incurred.    Second, even if the DiStefanos could point to sufficient evidence of harm to ground this claim, they have failed to set forth any legal theory justifying an award of damages.  "We have steadfastly deemed waived issues raised on appeal in a perfunctory manner, not accompanied by developed argumentation."  <u>United States</u> v. <u>Bongiorno</u>, 106 F.3d 1027, 1034 (1st Cir. 1997); <u>see</u> <u>also</u> <u>United States</u> v. <u>Rosario-Perala</u>, 199 F.3d 552, 563 n.4 (1st Cir. 1999) (quoting <u>Bongiorno</u>); <u>United States</u> v. <u>Salimonu</u>, 182 F.3d 63, 74 n.10 (1st Cir. 1999) (determining that appellant had waived an argument by failing to develop it).  Aside from the factual averment described above and a single, unsupported assertion that Mr. DiStefano "was forced to defend against [a government] claim," the DiStefanos' initial brief nowhere provides an argument that the appellees owed them any duty relating to the legal fees at issue.  Their reply brief similarly mentions the harm, noting that it would not have occurred but for the appellees' misdeeds, but fails even to sketch a theory of liability upon which recovery would be appropriate.  At oral argument, the DiStefanos' counsel cited the legal fees as an example of the losses for which they were seeking relief, but again neglected to link those losses to any duty on Dialessi's part.  This

-22-

argument, then, has not been developed to a degree sufficient to warrant our consideration.

**AFFIRMED.** Costs to appellees.